IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Jesse Bruton,

      Plaintiff,

      v.                    Case No. 2:16-cv-928

American United Life
Insurance Company,

      Defendant.

<u>OPINION AND ORDER</u>

This is an action filed by Jesse Bruton, a former employee of Resource Ventures, LTD, dba Resource Interactive ("Resource Ventures"), pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(a)(1)(b). Plaintiff seeks to recover benefits under the Resource Ventures employee disability benefits plan ("the Plan"), which consists of a Group Long Term Disability Income Insurance Policy issued by defendant American United Life Insurance Company ("AUL"). The claims administrator of this policy is Disability Reinsurance Management Services, Inc. ("DRMS"). CF 88.

In summary, plaintiff was previously employed by Resource Ventures in a technology position. His last day of work was February 6, 2015. Plaintiff filed an application dated February 13, 2015, for short term disability benefits, with an alleged disability onset date of February 9, 2015. CF 376-77. He claimed to be disabled by back pain which he had experienced for seven to eight years, with no causation indicated. By letter dated March 30, 2015, plaintiff was notified by DRMS that his application for twelve weeks of short term disability benefits had been approved, and that he could apply for long term disability ("LTD") benefits.

CF 318.  Short term disability benefits commenced effective February 16, 2015, and were payable until May 11, 2015.  CF 318, 322.

Plaintiff applied for LTD benefits under the Plan in April, 2015.  To qualify for LTD benefits, plaintiff had to provide proof that his conditions met the Plan's definition of total disability as of May 12, 2015.  Plaintiff claimed to be disabled due to low back pain and mental problems, including depression.  In support of his application, plaintiff submitted medical records, including treatment records and attending physician statements from his primary care physician, notes from a neurological consultation, the results of a 2015 MRI, records of a psychiatric consultation, and physical therapy records.  DRMS had these records reviewed by a claims analyst, a nurse consultant, and a physician.

DRMS concluded that plaintiff failed to meet the "Regular Attendance" requirement for total disability, which related to plaintiff's receipt of appropriate medical treatment for his claimed disability.  See Plan, Section 2, P 68, and infra., p. 7.  DRMS concluded that plaintiff failed to meet this requirement because: 1) his current treatment was not the most appropriate to maximize medical improvement (plaintiff did not pursue aquatic therapy or a repeat MRI as recommended by his primary care physician); he failed to visit a physician according to standard medical practice to effectively manage and treat his back pain (noting that plaintiff's primary care physician, who treated plaintiff with increasing doses of narcotics, was not a specialist in the management of chronic pain); and 3) he did not follow through with a referral to a pain management specialist.  DRMS also

concluded that the medical records did not support a finding of impairment from his regular occupation, which was performed at a sedentary physical demand level.  By letter dated July 17, 2015, DRMS notified plaintiff that his claim for LTD benefits was denied. CF 123.

Plaintiff pursued an appeal of that decision, and submitted additional medical records from his primary care physician, his psychiatrist, pain management specialists, and records from his hospitalization from July 19-23, 2015, due to a reaction to multiple medications and alcohol use.  The administrative record was reviewed by a nurse consultant and a physician consultant who was board certified in occupational medicine.  DRMS concluded that, with the exception of July and August, 2015 (the period surrounding his July 2015 hospitalization), plaintiff was capable of performing full-time sedentary physical demand level work, which was the level at which his regular occupation was performed.  By letter dated May 26, 2016, DRMS notified plaintiff that the original decision to deny benefits was appropriate and his appeal was denied.  CF 395.

Plaintiff then filed the instant ERISA action to recover benefits.  This matter is now before the court on the parties' cross-motions for judgment on the administrative record.

I. Standard of Review

A plan administrator's denial of benefits is reviewed de novo unless the benefit plan specifically gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  Morrison v. Marsh & McLennan Companies, Inc., 439 F.3d 295, 300 (6th Cir. 2006).  Generally,

where an ERISA plan gives the plan administrator such discretionary authority, the administrator's decision is reviewed under the arbitrary and capricious standard. <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 111 (1989).

The Plan clearly gives AUL discretionary authority. The Plan provides in relevant part:

> Benefits under the Group Policy will be paid only if AUL decides in its discretion that the applicant is entitled to them. Except for the functions the Group Policy explicitly reserves to the Participating Unit or Trustee, AUL reserves the right to: 1) manage the Group Policy and administer claims under it; and 2) interpret the provisions and resolve any questions arising under it.
>
> AUL's authority includes, but is not limited to, the right to: 1) establish and enforce procedures for administering the Group Policy and claims under it; 2) determine Employees' eligibility for insurance and entitlement to benefits; 3) determine what information AUL reasonably requires to make such decisions; and 4) resolve all matters when a claim review is requested.

Plan, Section 7, P 80. The distinguishing factor in this case is that the decisions on plaintiff's claim for benefits and his later appeal were made by DRMS, an agent of AUL.

AUL argues that the arbitrary and capricious standard of review still applies, citing <u>Aschermann v. Aetna Life Ins. Co.</u>, 689 F.3d 726, 728-30 (7th Cir. 2012)(under common law trust principles, a plan administrator may delegate discretionary authority under the plan to a third party, even if the plan does not expressly authorize such delegation, if there is no prohibition against delegation in the plan document). However, the Sixth Circuit has held that an ERISA fiduciary may delegate its fiduciary responsibilities to a third party only if the plan establishes procedures for such delegation. <u>See</u> <u>Lee v. MBNA Long Term</u>

4

<u>Disability & Benefit Plan</u>, 136 F. App'x 734, 742 (6th Cir. 2005)(citing 29 U.S.C. §1105(c)(1)("The instrument under which a plan is maintained may expressly provide for procedures ... (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities[.]")). When the decision to revoke or deny benefits is made by an entity other than the one authorized by the procedures set forth in a benefits plan, the de novo standard of review applies. <u>Shelby County Health Care Corp. v. Majestic Star Casino, LLC Group Health Benefit Plan</u>, 581 F.3d 355, 365 (6th Cir. 2009); <u>Sanford v. Harvard Industries, Inc.</u>, 262 F.3d 590, 597 (6th Cir. 2001).

In this case, there is no language in the Plan which permits AUL to delegate its discretionary authority to decide claims to an agent, nor is there any evidence that AUL was involved in the claims decision process in this case. The court concludes that the de novo standard of review applies in this case.

## II. De Novo Review Standard

In applying the de novo standard of review, "the role of the court reviewing a denial of benefits 'is to determine whether the administrator ... made a correct decision.' The administrator's decision is accorded no deference or presumption of correctness." <u>Hoover v. Provident Life & Accident Ins. Co.</u>, 290 F.3d 801, 808-09 (6th Cir. 2002)(quoting <u>Perry v. Simplicity Eng'g</u>, 900 F.2d 963, 966-67 (6th Cir. 1990)). Review is limited to the record before the administrator. <u>Moore v. Lafayette Life Ins. Co.</u>, 458 F.3d 416, 430 (6th Cir. 2006). The de novo standard of review applies to the plan administrator's factual determinations and legal conclusions.

*Rowan v. Unum Life Ins. Co.*, 119 F.3d 433, 435 (6th Cir. 1997).

In an ERISA denial-of-benefits suit, the plaintiff must prove by a preponderance of the evidence that he was disabled as that term is defined by the plan. *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 700 (6th Cir. 2014). In applying the de novo standard, the court must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan. *Hoover*, 290 F.3d at 809. "When a court reviews a decision de novo, it simply decides whether or not it agrees with the decision under review." *Perry*, 900 F.2d at 966.

Federal rules of contract interpretation apply in construing plan terms. *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998). Plan provisions are interpreted according to their plain meaning, in an ordinary and popular sense. *Id.* "The language in an insurance policy 'is to be given its ordinary meaning unless it is apparent from a reading of the whole instrument that a different or special meaning was intended.'" *Stockman v. GE Life, Disability and Medical Plan*, 625 F. App'x 243, 250 (6th Cir. 2015)(quoting *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 942 (6th Cir. 1993)). In applying this plain meaning analysis, effect must be given to the unambiguous terms of an ERISA plan. *Perez*, 150 F.3d at 556. Any ambiguities in the language of the plan are to be construed strictly against the drafter of the plan. *Regents of Univ. of Mich. v. Empls. of Agency Rent-A-Car Hosp. Ass'n*, 122 F.3d 336, 339-40 (6th Cir. 1997). The language of a plan is ambiguous only "if it is subject to two reasonable interpretations." *Citizens Ins. Co. of Am. v. MidMichigan Health*

ConnecCare Network Plan, 449 F.3d 688, 694 (6th Cir. 2006).


III. Relevant Plan Terms

Under the terms of the Plan, a person is "TOTALLY DISABLED" if:

> because of Injury or Sickness a Person is: 1) under the Regular Attendance of a Physician for that Injury or Sickness; 2) is not working in any occupation; and 3) cannot perform the Material and Substantial Duties of his Regular Occupation[.]

Plan, Section 2, P 69.

In relevant part, the term "REGULAR OCCUPATION" means:

> a Person's occupation as it is recognized in the general workplace and according to industry standards. A Person's occupation does not mean the specific job tasks a Person does for a Participating Unit or at a specific location.

Plan, Section 2, P 68.

The term "REGULAR ATTENDANCE" means that a Person:

> 1) personally visits a Physician as medically required according to standard medical practice, to effectively manage and treat his Disability; 2) is receiving the most appropriate treatment and care that will maximize his medical improvement and aid in his return to work; and 3) is receiving care by a Physician whose specialty or clinical experience is appropriate for the Disability.

Plan, Section 2, P 68.

The Plan sets forth claim procedures to be followed by Plan participants. These procedures require the completion and submission of a claim form for proof of loss, which must show the date the disability started, the cause of the disability, and the nature and extent of the disability. Plan, Section 7A, P 82. The Plan further states that AUL will also periodically send the claimant "additional claim forms or requests for information

necessary to determine eligibility for benefits under the Group Policy." Plan, Section 7A, P 82. Benefits are payable when AUL receives the completed claim form or proof of disability. Plan, Section 7A, P 82. The Plan further provides that the monthly benefit

> will be paid as long as the disability continues provided that proof of continued Disability is submitted to AUL upon request and the Person is under the Regular Attendance and care of a Physician. The proof must be submitted at the Person's expense.

Plan, Section 8, P85. The Plan further provides that monthly benefits for total disability will cease on the earliest of several specified events, including "2) the date a Person ceases to be Disabled; ... 5) the date the Person fails to give AUL required proof of his Disability; ... and 7) the date the Person is no longer under the Regular Attendance and care of a Physician. Plan, Section 8, P 89.


IV. Administrative Record

The court has reviewed the administrative record, which is over two thousand pages long. The fact that any particular record is not mentioned does not mean that it was not considered. The medical records and other documents are summarized in roughly chronological order to show plaintiff's course of treatment. Although the DRMS decision letters do not constitute evidence for purposes of de novo review, they are included in this summary to give a complete picture of the administrative procedure used in processing plaintiff's claim and DRMS's reasons for denying the claim.

8

<u>Nikesh Batra, M.D.</u>

Plaintiff was seen on September 7, 2013, by Nikesh Batra, M.D., a pain management specialist. The symptoms reported by plaintiff included muscle and joint pain and depression. CF 469, 471. The examination revealed a normal gait with no hip hike or cadence abnormality, but plaintiff complained of lower back and lower right extremity tenderness and pain. CF 472. Dr. Batra discussed various treatment options, including medication and lumbar epidural steroid injections. CF 472. This is the only treatment record from Dr. Batra.

<u>Jennifer A. Briones, M.D.</u>

Jennifer A. Briones, M.D., plaintiff's primary care physician, saw plaintiff on May 21, 2014, for back pain, which he complained had been increasing in the previous two months. She continued plaintiff on 100 mg. Nucynta tablets. On physical exam, Dr. Broines noted tender paraspinal muscles bilaterally, but a normal curvature of the spine, no vertebral spine or joint tenderness, a negative straight leg raising test, and normal motor system, sensory, reflex and gait exams. CF 280.

On November 14, 2014, plaintiff complained of low back pain, with pain radiating to his left leg. The physical exam showed tender paraspinal muscles, but the remainder of the physical exam was normal. Dr. Briones prescribed 200 mg. Nucynta ER tablets. CF 275.

On January 12, 2015, Dr. Briones saw plaintiff for low back pain. Plaintiff denied radiating pain, tingling or numbness. Plaintiff expressed concern that the pain medication reduced his productivity at work, as his job was very analytical. On physical

examination, Dr. Briones again noted tender paraspinal muscles, but the remainder of the physical exam was normal.  CF 273.

MRI Examination

On January 19, 2015, plaintiff underwent an MRI of the lumbar spine, which was compared to the results of a July 1, 2010, MRI exam.  Daniel J. White, M.D., stated in his report that there was no significant abnormality at L 1-2, L 2-3 and L 3-4.  The scan showed mild lower lumbar spondylosis at L4-5 and L5-S1, mild acquired central canal stenosis at L4-5, minimally increased from 2010, and mild foraminal narrowing at L4-5 and L5-S1, without significant interval change from the 2010 exam.  CF 246.

Dr. Briones

On February 3, 2015, plaintiff complained of back pain, a high stress level, low energy, depression, and feeling overwhelmed and worried.  On physical exam, Dr. Briones noted tender paraspinal muscles, but the remainder of the physical exam was normal.  Dr. Briones diagnosed low back pain, depression and anxiety.  CF 271.

On February 12, 2015, Dr. Briones completed an attending physician statement.  She indicated that plaintiff had chronic low back pain, and that he had been treated with pain medication, a TENS unit, and epidural injections.  She noted that an MRI revealed spinal stenosis and spondylosis.  Dr. Briones stated that plaintiff was house confined.  CF 373.  In terms of functional limitation, she rated plaintiff at Class 3 (marked limitations) and checked the box for sedentary activity.  Dr. Briones indicated that plaintiff could occasionally bend, climb, reach, kneel, squat, crawl, push/pull, and lift up to ten pounds.  She specified that plaintiff could not engage in  work requiring bending, twisting, being on his

feet more than thirty minutes at a time, or sitting more than one hour at a time.  She also noted that plaintiff had depression with anxiety and memory loss.  CF 374.  Dr. Briones indicated that her plan was to return plaintiff to work on May 8, 2015.  CR 374.

Rebecca P. Brightman, M.D.

The record includes the February 16, 2015, consultation notes of Dr. Rebecca P. Brightman, a neurologist.  Dr. Brightman noted plaintiff's complaints of low back and increased right leg pain. Plaintiff reported that epidural injections helped only temporarily, and that he could not walk a distance due to pain. The examination showed positive straight leg raising on the right at ninety degrees, normal motor, sensory and reflex testing of the lower extremities, good peripheral muscle tone, and a normal mental status exam.  Dr. Brightman indicated that the MRI showed mild to moderate spinal stenosis in two locations, and that the disks looked good, with no degenerative disk disease.  Dr. Brightman diagnosed moderate spinal stenosis and referred plaintiff to Dr. Kirk Whetstone, a physical medicine and rehabilitation specialist. CF 255-256.

Dr. Briones

Plaintiff saw Dr. Briones on March 10, 2015, shortly after starting on oxycodone.  Plaintiff stated that his pain was exacerbated by going down stairs and prolonged sitting.  The physical exam showed tender paraspinal muscles and an unsteady gait, but the remainder of the exam was normal.  CF 269.

Dr. Briones saw plaintiff on March 16, 2015, for low back pain.  The physical examination revealed tender paraspinal muscles and a diminished motor system but a normal exam otherwise.

Plaintiff denied having radiating pain and stated that the pain was better controlled with the current therapy. Plaintiff also reported high stress, sleep disturbance, low energy level, depressed mood, feeling overwhelmed, anxiety attacks, and worrying, but stated that his mood irritability was better since his pain was better managed. CF 267. These treatment notes indicated that documents were sent again by fax for plaintiff's referral to Dr. Whetstone. CF 268.

The treatment notes for March 23, 2015, state that Dr. Briones had previously changed plaintiff's pain medication from Norco to 30 mg. oxycodone, and that he was seen by a psychiatrist who prescribed Cymbalta. Plaintiff reported that he had noticed no significant reduction in pain or improvement in mood yet. The physical exam showed tender paraspinal muscles, diminished strength with right hip flexion and toe dorsiflexion, and a gait favoring the affected side. Dr. Briones also noted a normal curvature of the spine, no vertebral or S1 joint tenderness, and normal sensory and reflex exams. Dr. Briones stated that she would consider increasing the dosage of oxycodone to 40 mg. CF 265.

Managed Disability Analyst Alexandra White spoke with plaintiff in a phone call on March 20, 2015. Plaintiff stated that physical therapy was not working. He also indicated that he was seeing a counselor and a psychiatrist, who had prescribed Cymbalta. Plaintiff also stated that Dr. Briones had prescribed hydrocodone and oxycodone, and that, without medication, he is in bed. Plaintiff reported going to physical therapy once a week. He stated that he was able to get up and walk around the house, but that he did not do much house work and was not driving or going out

socially.  CF 327.

<u>Application for Short Term Disability Benefits</u>

Plaintiff's last day of work was February 6, 2015.  Plaintiff filed an application dated February 13, 2015, for short term disability benefits, with an alleged disability onset date of February 9, 2015.  CF 376-77.  A March 30, 2015, claim summary authored by DRMS Managed Disability Analyst Alexandra White indicated that DRMS reviewed the medical records discussed above. CF 323.  On February 26, 2015, and March 30, 2015, Cindi Read, RN, a DRMS nurse consultant, reported that she had reviewed the records and the February attending physician statement of Dr. Briones and Dr. Brightman's records.  CF 352, 363.  Nurse Read commented that it would be reasonable to award short term disability benefits through May based on the restrictions and limitations posited by Dr. Briones, and that plaintiff's physical and mental health conditions, taken together, would be impairing, but that it was unclear whether his mental conditions alone would be impairing.  CF 352.  She recommended obtaining additional records.  CF 352.

Analyst White spoke with plaintiff in a phone call on March 20, 2015.  Plaintiff stated that physical therapy was not working. He also indicated that he was seeing a counselor and a psychiatrist, who had prescribed Cymbalta.  Plaintiff also stated that Dr. Briones had prescribed hydrocodone and oxycodone, and that, without medication, he is in bed.  Plaintiff reported going to physical therapy once a week.  He stated that he was able to get up and walk around the house, but that he did not do much house work and was not driving or going out socially.  CF 327.

By  letter dated March 30, 2015, plaintiff was notified by

DRMS that his application for twelve weeks of short term disability benefits, the maximum possible duration, had been approved, payable from February 16, 2015, until May 11, 2015. CF 318, 322. Plaintiff was advised that he could apply for LTD benefits. CF 318. DRMS asked plaintiff to have his physician complete an attending physician's statement and return it to DRMS, and advised plaintiff that DRMS would begin the review of his LTD claim upon receipt of the completed form. CF 318. Plaintiff was further notified that DRMS would likely request additional medical or other information to evaluate his eligibility for LTD benefits. DF 318.

By letter from DRMS Senior Managed Disability Analyst Matthew Nixon dated April 24, 2015, plaintiff was advised that his application for LTD benefits had been received, and that the evaluation of his eligibility for benefits had begun. Mr. Nixon advised plaintiff that disability claims "can sometimes involve a detailed and lengthy evaluation process." CF 311. The letter also described the claim review and appeal procedures. CF 312.

Mount Carmel Rehab Services

The record includes physical therapy treatment notes from Mount Carmel Rehab Services. On March 27, 2015, plaintiff complained of right side sciatica. CF 182. The therapist noted radicular symptoms, lumbar instability, decreased hip strength, flexibility and core stability, and muscle spasm and concluded that plaintiff would benefit from skilled physical therapy. CR 183. Treatment notes dated April 14, April 16, and April 23, 2015, reported that a trigger point release was performed and recommended continued therapy. CF 193, 195, 197. Plaintiff cancelled treatment sessions scheduled on April 21, April 28, and May 18,

14

2015.  CF 200-202.  Treatment notes on April 30, 2015, stated that there were no improvements in symptoms, and that plaintiff would try aquatic therapy.  CF 186.  A discharge summary dated May 28, 2015, indicated that plaintiff called to cancel the aquatic therapy, stating that he was in too much pain to tolerate therapy. He did not call back to reschedule and was discharged from therapy. CF 188.

Dr. Briones

On March 30, 2015, Dr. Briones noted that plaintiff had tender paraspinal muscles and a gait favoring the affected side, but the remainder of the exam was normal.  CF 263.  Dr. Briones increased plaintiff's dosage of oxycodone to 40 mg.  CF 264.

Dr. Briones saw plaintiff on April 20, 2015, for complaints of back pain.  Plaintiff reported that he had stopped taking Norco in the evening, and that his mood was not improving with Cymbalta.  On examination, plaintiff had tender paraspinal muscles, diminished hip flexion and toe dorsiflexion on the right, and a gait favoring the affected side, but a normal curvature of the spine with no vertebral spine or S1 joint tenderness, negative straight leg raising test, and normal sensory and reflex exams.  She continued plaintiff on oxycodone and Norco.  CF 303.

On April 20, 2015, Dr. Briones completed an attending physician's statement, which plaintiff submitted to DRMS to begin the review of his LTD benefits claim.  See CF 318.  Dr. Briones noting spinal stenosis, sciatica, depression with anxiety, depressed mood, high stress and low energy levels, and radiation of pain with numbness, with a disability onset date of February 9, 2015.  In describing plaintiff's limitations, Dr. Briones specified

15

that plaintiff should avoid and/or was incapable of bending, twisting, lifting, strenuous activity, exercising outside a physical therapy program, and coping with stressful, high emotional situations. CF 319. Dr. Briones indicated that plaintiff could engage in zero hours of sedentary activity, and rated his mental/nervous impairment as posing Class 4 marked limitations (unable to engage in stress situations or engage in interpersonal relations). She also stated that plaintiff was house confined and that she did not expect any significant improvement in the future. CF 320.

In her treatment notes of April 28, 2015, Dr. Briones stated that plaintiff had attended physical therapy at Mt. Carmel, but reported worsening symptoms. On physical examination, Dr. Briones noted tender paraspinal muscles, diminished hip flexion and toe dorsiflexion, and a gait favoring the affected side, but no vertebral spine or S1 joint tenderness, a negative straight leg raising test, and normal sensory and reflex exams. CF 259. She continued to prescribe 40 mg. oxycodone and Norco for pain. CF 260.

Dr. Souhair Garas

After an initial assessment was completed by Central Ohio Counseling on March 12, 2015, see CF 736, plaintiff was seen by Dr. Souhair Garas, a psychiatrist, on April 27, 2015. Dr. Garas noted plaintiff's complaint that his depression had become much worse, and prescribed Cymbalta and Buspar. CF 751.

Analyst Nixon – Phone Call

Plaintiff spoke by phone with Analyst Nixon on May 8, 2015. Plaintiff reported that he had experienced back trouble for seven

16

years.  Plaintiff stated that his back pain had increased drastically in the past year, and that he was absent from work starting February 9, 2015.  Plaintiff reported that he started having sciatica pain radiating down his leg.  Plaintiff claimed that he tried physical therapy, but it didn't work, and he was considering aquatic therapy.  Plaintiff stated that his pain medication, including oxycodone and hydrocondone, affected his work performance.  He indicated that he was able to manage all daily activities, but did not like to shower unless his wife was home, and that walking and sitting made the pain worse.  Plaintiff reported that he prepared breakfast, watched TV, read books online, did a few chores which do not involve lifting or bending, walked in the yard once or twice a day, and washed dishes or helps with dinner preparation if he was up to it, but that he was not able to engage in any sustained activities.  He avoided the stairs and could not do yard work, and he stopped going to church.  CF 118-119.

Dr. Briones

Dr. Briones saw plaintiff on May 26, 2015.  She noted that the pharmacy had dispensed Oxycontin 60 mg., although the prescription was supposed to be for 40 mg Oxycontin.  Plaintiff reported pain despite the increased dosage.  Dr. Briones discussed the need for another MRI, but plaintiff stated that he preferred to delay the MRI for four weeks until he has changed to new insurance.  On physical examination, Dr. Briones reported tender paraspinal muscles, diminished hip flexion on the right side, and a gait favoring the affected side, but a normal exam otherwise.  Dr. Briones increased plaintiff's dosage of oxycodone to 80 mg. extended release, and continued him on Norco.  CF 143.

<u>Analyst Nixon – Phone Call</u>

Analyst Nixon spoke with plaintiff by phone on June 17, 2015. Plaintiff stated that he was unable to get an appointment with Dr. Whetstone. Plaintiff indicated that Dr. Briones wanted him to have another MRI, but that he could not afford it, as his insurance would not pay for it. Plaintiff reported that he can only stand for an hour or two a day and has sciatica pain. He stated that he tries to do dishes but pain increases with any activity. He stated that he rarely goes outside and can't walk around the block. CF 175.

In a later phone conversation with Analyst Nixon on July 14, 2015, plaintiff stated that the MRI in January cost $1,200 and he couldn't afford another one. Plaintiff also claimed that there was a three-month wait to see Dr. Whetstone, and since he was already doing physical therapy, he didn't see the point. Mr. Nixon then informed plaintiff that DRMS had learned that plaintiff had an appointment with Dr. Whetstone on April 21, 2015, but that plaintiff did not attend that appointment. Plaintiff then stated that this was because of cost and because he had seen a pain management provider for injections in the past and they never worked. CF 100.

<u>Nancy Wiley-Gilpatrick, Vocational Rehabilitation Counselor</u>

In a June 18, 2015, report, Nancy Wiley-Gilpatrick, a vocational rehabilitation counselor, reviewed the job description and physical demands of plaintiff's past occupation as a technology development manager. CF 164, 1777-78. Plaintiff's former employer, Resource Ventures, was an entrepreneurial marketing agency for businesses seeking to build their brands. Plaintiff's job duties included developing web sites, managing and staffing

technology teams, and managing the web development team.  CF 164.
Ms. Wiley-Gilpatrick was asked to determine the physical demands of
plaintiff's job as it is performed in the national economy (i.e.,
the general workplace).    Ms. Wiley-Gilpatrick found that
plaintiff's occupation was most analogous to the position of
Manager, Data Processing, DOT Code 169.167-030.  CF 164.  This is
a position performed at the sedentary level in the national
economy.   CF 164.  Sedentary work is defined as work which
involves exerting up to ten pounds of force occasionally (up to
one-third of the time), exerting a negligible amount of force
frequently to lift, carry, push, pull or otherwise move objects,
including the human body, and sitting most of the time, with brief
periods of time for walking or standing required only occasionally.
CF 164.   Ms. Wiley-Gilpatrick noted that although the job
description for plaintiff's job stated that the position may
require up to twenty percent travel to and from current or
potential client sites, conferences, seminars or training sessions,
see CF 1778, his occupation, as performed in the national economy,
is performed at a sedentary level and does not require a high level
of travel so as to raise the physical demand level.  DF 164.

Dr. Briones

     Dr. Briones saw plaintiff on June 24, 2015.  Plaintiff
complained about sharp shooting pain in his back.  He stated that
he couldn't walk more than ten minutes, that he had pain radiating
to the right knee, and that his wife helped him to shower, as he
fell once getting into the shower.  Dr. Briones' examination
revealed tender paraspinal muscles, diminished hip flexion and toe
dorsiflexion on the right, diminished right patellar reflex, and
gait favoring the affected side, but a normal curvature of the

19

spine, with no vertebral spine or joint tenderness, and a negative straight leg raising test. She again recommended another spine MRI, but plaintiff indicated that he preferred to settle his disability issues first due to financial constraints. CF 145.

Linda Waterman, RN

Linda Waterman, RN, a nurse medical consultant, reviewed plaintiff's claim file and provided her analysis of plaintiff's records in a report dated June 23, 2015. CF 157-162. Nurse Waterman noted:

-the lack of significant change between the 2010 and 2015 MRI's;

-plaintiff's failure to attend his scheduled appointment with Dr. Whetstone, which was inconsistent with his statement that he was unable to get an appointment;

-plaintiff's failure to pursue aquatic therapy and pain management treatment;

-although records from Dr. Briones noted tenderness with palpitation to the paraspinal muscles and occasional findings of decreased strength and gait favoring the affected side, other exam findings were normal, and the findings as a whole were inconsistent with a significantly impairing back condition;

-Dr. Briones's February 12, 2015, evaluation stating that plaintiff was capable of sedentary level activity;

-the lack of clear change since February to support Dr. Briones' April 2015 attending physician statement that plaintiff was incapable of even sedentary activity;

-the lack of psychiatric counseling records with the exception of a visit to a psychiatrist on April 27, 2015; and

-plaintiff's claim that he was attending only monthly counseling sessions was inconsistent with a significantly impairing mental condition.

CF 161.

Nurse Waterman concluded that:

-the medical records did not support the restrictions
listed in Dr. Briones's April 20, 2015, attending
physician's statement;

-although plaintiff continued to report increased pain,
there was minimal objective data to support a significant
loss of function due to back pain;

-it was not clear that plaintiff's increased opiate use
reflected the severity of his impairment because the
increased level might be due to tolerance to the
medication; and,

-although it was not unreasonable for plaintiff's primary
care physician to monitor his narcotics, given
plaintiff's reports of significantly decreased function
and increased pain, it was not clear why plaintiff did
not seek out additional treatment with Dr. Whetstone for
pain management as recommended by Dr. Brightman.

CF 161-62.

By letter dated June 23, 2015, Nurse Waterman invited Dr.
Briones to respond to her review of plaintiff's records. CF 152-
153. Nurse Waterman noted that plaintiff's physical exams and the
MRIs showed minimal findings; that plaintiff's statements regarding
his ability to receive appropriate treatment were inconsistent;
that it was unclear what would preclude plaintiff from doing
sedentary work; and that the ability to briefly change position for
comfort in his immediate work environment would be a reasonable
accommodation. CF 153.

In a letter received by Nurse Waterman on July 9, 2015, see CF
137, Dr. Briones responded that plaintiff had demonstrated
increasing left lower extremity weakness. Dr. Briones noted that
she had recommended another MRI, which plaintiff declined due to
the cost. She stated that plaintiff required pain medication
around the clock to stabilize and assist in managing his pain,

21

which affected his memory and processing.  Dr. Briones stated that she did not believe that plaintiff could return to work in a sedentary capacity.  CF 142.

File Review by Karyn Tocci, M.D.

On July 9, 2015, Nurse Waterman discussed plaintiff's file with Karyn Tocci, M.D.  Nurse Waterman's notes concerning the meeting indicate that they discussed plaintiff's treatment by Dr. Briones with progressive increases in narcotic dosages since March 10, 2015, and concluded that the exams by Dr. Briones showed minimal findings but some abnormalities.  They discussed the fact that although plaintiff claimed that he could not obtain an appointment with Dr. Whetstone, Dr. Whetstone's office informed DRMS that plaintiff had an appointment but failed to appear.  They also noted that although Dr. Briones recommended aquatic therapy, plaintiff failed to attend his aquatic therapy session on May 26, 2015.  A recommendation was made for a functional capacity evaluation (FCE).  CF 103.

On July 10, 2015, Nurse Waterman, DRMS Manager Kathryn Ferrante, Analyst Nixon and Dr. Tossi met to discuss plaintiff's claim file.  CF 102.  According to Nurse Waterman's notes of the meeting, Ms. Ferrante and Mr. Nixon asked if plaintiff's current treatment with narcotics prescribed by Dr. Briones would satisfy the Plan requirements for "regular attendance."  Reference was made to Nurse Waterman's review summary, which noted that plaintiff had been referred to a pain management and rehabilitation specialist (Dr. Whetstone) and aquatic therapy (after failing a course of traditional physical therapy) but that plaintiff had not undergone these treatments, nor did he have the recommended repeat MRI.  CF 102.  The meeting participants also discussed the fact that

plaintiff's pain was currently being managed with increasing doses of narcotics by Dr. Briones, a family practitioner who would not be considered a specialist in pain management. They found this troubling "particularly in light of plaintiff's increasing pain levels despite increasing doses of narcotics." CF 102. The participants at the meeting concluded:

> Given the above, it does not appear the Claimant's current treatment is most appropriate to maximize medical improvement, he has not visited a physician according to standard medical practice to effectively [manage] and treat his back pain, and he is not receiving care from a physician whose specialty or clinical expertise is appropriate.

CF 101-102.

Denial of Benefits Letter

By letter dated July 17, 2015, plaintiff was advised by DRMS that his LTD claim had been denied. CF 123. After thoroughly discussing the medical records, including the records of Dr. Brightman and Dr. Briones, as well as Nurse Waterman's June 23, 2015, review of plaintiff's records and the medical consultant review with Dr. Tossi on July 10, 2015, DRMS concluded that plaintiff did not satisfy the requirement of being under the regular attendance of a physician because: his current treatment was not the most appropriate to maximize medical improvement; he had not visited a physician according to standard medical practice to effectively manage and treat his back pain; and he was not receiving care from a physician whose specialty or clinical expertise was appropriate. CF 124-26. DRMS also noted Ms. Wiley-Gilpatrick's review of the physical demands of plaintiff's regular sedentary occupation completed on June 18, 2015, and found that the medical records did not support impairment from plaintiff's

sedentary regular occupation. CF 123-24. DRMS decided that plaintiff did not satisfy the definition of total disability. CF 126. By letter dated July 30, 2015, counsel for plaintiff notified DRMS that an appeal would be filed. CF 96.

Dr. Briones

Dr. Briones saw plaintiff on July 8, 2015, for back pain. She prescribed medication, including oxycodone. She noted tender paraspinal muscles, diminished hip flexion and an unsteady, slouching and shuffling gate, but a normal spine curvature and no spine tenderness. CF 775.

Hospital Admission

Plaintiff was admitted to the hospital on July 19, 2015, with complaints of abdominal pain, nausea, vomiting, diarrhea, and altered mental state. He was discharged on July 23, 2015. CF 806-875. A record dated July 20, 2015, indicated that plaintiff, who was opiate dependent, had stopped taking his pain medications the day before due to constipation, that he was also taking medication for his mental problems, that a number of these medications had been changed recently, and that plaintiff also consumed about four to five beers three to four times a week. CF 847. The record stated that plaintiff's symptoms were likely due to his medications. CF 847. The hospital records also indicate that plaintiff reported that he visited a farm the previous weekend and walked along a stream, and that he traveled to New Mexico in April. CF 849.

Dr. Briones

Dr. Briones saw plaintiff on August 5, 2015. Her treatment notes indicated that plaintiff complained of back pain and was continued on Oxycodone. CF 773.

<u>Dr. Michael J. Simek, M.D.</u>

Plaintiff was seen by Dr. Simek, a physical medicine and rehabilitation specialist, on August 17, 2015. During the examination, plaintiff was extremely limited in the lumbar spine area with flexion and extension with poor effort due to pain, but the examination showed no abnormality, the spine was negative for posterior tenderness, no motor weakness was noted, and balance and gait were intact. Dr. Simek saw no indication for surgery on the imaging studies. He noted that physical therapy and injections had not helped, but he encouraged plaintiff to continue with a home exercise program. Dr. Simek discussed alternative treatment options, and plaintiff mentioned that he might look into acupuncture. CF 453. This is the only treatment record from Dr. Simek.

<u>Dr. Briones</u>

Dr. Briones saw plaintiff on October 7, 2015. Examination revealed tender paraspinal muscles, diminished hip flexion on the right and a shuffling gait, but a normal curvature of the spine, no vertebral spine tenderness and normal reflexes. CF 443. On January 8, 2016, Jessica Manly, CNP, a nurse practitioner in Dr. Briones's office, saw plaintiff for low back pain. Plaintiff denied radiation of pain, tingling or numbness. He had normal sensation, strength and gait, and no spinal tenderness. Medication was prescribed, and plaintiff was referred to Dr. Dwight Mosley for further evaluation. CF 441-442.

<u>Claims Bureau USA, Inc.</u>

The record includes a surveillance report from Michael Ackley of Claims Bureau USA, Inc. CF 585-593. The surveillance at plaintiff's residence on February 4, 5 and 12, 2016, resulted in

few confirmed sightings of the plaintiff.  On February 5, 2016, plaintiff was seen getting into the passenger seat of a vehicle. Plaintiff's wife entered the vehicle on the driver's side, and the vehicle left the residence.  CF 591.  On February 12, 2016, plaintiff was observed driving a vehicle onto the driveway of his residence.  Plaintiff's hands were full of papers, and he used his left foot to kick open the driver's side door and hold it open.  He did not show any guarded motion while walking towards the residence.  CF 592.

Dr. Dwight Mosley

Plaintiff was seen on February 12, 2016, by Dwight Mosley, M.D., a pain management specialist.  Plaintiff was determined to be at high risk for medication misuse.  CF 446.  On examination, Dr. Mosley found tenderness and spasms in the lumbar spine and paravertebral muscles, with a limited range of motion in that area. Dr. Mosley concluded that because more conservative therapy was not working, plaintiff's next option was surgery or a spinal cord stimulator.  CF 487.  He referred plaintiff back to Dr. Briones for medication management.  CF 489.

Dr. Souhair Garas

The records of Dr. Souhair Garas, a psychiatrist with Central Ohio Counseling, were provided by plaintiff's counsel with a letter dated December 19, 2015.  CF 734.  Plaintiff saw Dr. Garas on July 16, 2015, at which time plaintiff complained that his depression was getting worse, and a new combination of medication was prescribed.  CF 752.  Plaintiff also saw Dr. Garas on August 16, 2015, and November 12, 2015, and Dr. Garas continued plaintiff on medication.  CF 753-54.

By letter dated January 28, 2016, Nurse Janet Thurston asked

Dr. Garas to complete a mental capacity evaluation. CF 654-55. On February 24, 2016, DRMS Claims Analyst Andrea Dube received a voicemail from Dr. Garas's assistant, who stated that Dr. Garas was not going to respond to Nurse Thurston's letter or complete the medical evaluation form, as Dr. Garas did not think that plaintiff should be on disability. CF 602, 620-23.

Plaintiff was seen by Dr. Garas on February 16, 2016. Dr. Garas prescribed new medication. Dr. Garas observed that plaintiff had full affect, with no thought disorders, and that plaintiff reports that "in general, he is doing OK." CF 1026. On March 6, 2016, Dr. Garas prescribed new medication. CF 1025.

Janet Thurston, RN BSN

On December 29, 2015, Nurse Thurston completed a review of plaintiff's claim record. CF 757-765. She noted the following inconsistencies:

-plaintiff reported on June 17, 2015, that he could not get an appointment with Dr. Whetstone, but Dr. Whetstone's officer reported that plaintiff did not attend an appointment on April 21, 2015;

-exam findings, including those of Dr. Brightman, showed normal motor exam (strength), sensation and reflexes;

-Dr. Simek found extremely limited mobility of the lumbar spine, but no sensory loss or motor weakness, and balance, gait and coordination were intact;

-plaintiff's claims that he needed assistance with bathing and other activities of daily living were inconsistent with his reports that he traveled to New Mexico and walked on a farm;

-plaintiff was discharged from physical therapy due to lack of follow-up;

-the severity of reported pain symptoms was not consistent with the MRI and exam findings; and

-plaintiff's reports of memory problems with medication
were not consistent with the exam findings, with the
exception of the July 2015 hospitalization, or with
plaintiff's reports of his activities, and were not
supported by any neuropsychiatric testing.

CF 762-63.

Nurse Thurston observed that although plaintiff had treated with his primary care physician on a regular basis, treatment with a physical medicine and rehabilitation provider or a pain management provider would be appropriate specialities. CF 764. Nurse Thurston acknowledged that plaintiff saw Dr. Simek, a physical medicine and rehab provider, who stated that no surgery was necessary and suggested a home exercise program, and Dr. Brightman, a neurosurgeon who referred plaintiff to Dr. Whetstone. CF 687-88. Nurse Thurston also noted that although plaintiff was referred to Dr. Whetstone and to physical and aquatic therapy, plaintiff did not see Dr. Whetstone, and stopped going to physical therapy sessions. CF 687.

By letter to Dr. Briones dated February 25, 2016, Nurse Thurston noted her concerns regarding plaintiff's medical records and invited Dr. Briones to provide any additional information which would support her opinion concerning plaintiff's marked mental limitations. CF 597-98. No response was received. CF 518.

Stewart Russell, D.O.

Plaintiff's medical records were reviewed by Stewart Russell, D.O., an independent consultant board certified in occupational medicine. His findings were documented in a report dated April 18, 2016. CF 496-502. In regard to plaintiff's back problem, Dr. Russell noted that:

-the only finding on physical examination was tenderness

28

in the paraspinal musculature;

-the MRI findings of mild central stenosis were essentially identical to findings in 2010, after which plaintiff continued to work;

-there were no findings compatible with spinal stenosis in any physical exams;

-there was nothing to do surgery on, and the alleged pain generator had not been identified;

-pain as a symptom was not supported by the physical exam findings, and plaintiff's complaints of pain were in excess of that indicated by the objective imaging and physical examination findings; and

-rapidly increasing doses of opiates had not appreciably reduced plaintiff's pain, and because there were no random urine screens in the file or pain contract,[1] there was no evidence that plaintiff was taking his medication as directed.

CF 499-500. Dr. Russell concluded that, in light of the lack of physical exam findings and unchanged MRI evaluation for the last five years, plaintiff's pain complaints were in excess of what would be expected, and there was no physical condition present that

---

[1] A pain contract is an agreement between a pain management physician and a patient under which the patient agrees to comply with specified conditions as a prerequisite for treatment with opioid medications. See, e.g., Kellems v. Astrue, 382 F. App'x 512, 514 (7th Cir. 2010)(under pain contract, physician agreed to manage plaintiff's pain medications if patient promised to obtain ongoing psychological and psychiatric support for stress management, to stop taking methadone, and to not seek prescriptions from other doctors); Kovac v. Superior Dairy, Inc., 998 F.Supp.2d 609, 616 and n. 2 (N.D.Ohio 2014)(physician prescribed oxycodone and OxyContin for leg pain pursuant to pain contract under which plaintiff agreed to take the medication only as prescribed); Hommes v. Astrue, No. 1:12CV12, 20120 WL 550730 at *9 (N.D.Ohio Sept. 26, 2012)(where plaintiff signed pain contract agreeing not to take prescription medications from other physicians, treating physician stopped prescribing Percoset when informed that plaintiff was undergoing Suboxone treatment).

would preclude full-time sedentary activity.  CF 500.  He also opined that the restrictions and limitations posed by Dr. Briones in her physician's statement were overly restrictive, and were based solely on plaintiff's pain complaints without evidence of objective pathology, such as imaging studies or electrodiagnostic tests, to support plaintiff's complaints.  CF 500.

In regard to plaintiff's mental condition, Dr. Russell observed that treatment of plaintiff's depression with anti-anxiety medication and an antidepressant appeared to be successful and that plaintiff's psychiatrist, Dr. Garas, stated that plaintiff was not impaired by his mental health conditions.  Dr. Russell noted that cognitive side effects as a result of opiate use generally last less than two weeks, after which the patient adjusts to them.  Dr. Russell concluded that, in light of the length of time plaintiff had been taking opiates, plaintiff's claim that the drugs were impacting his memory and other cognitive abilities was not supported.  Dr. Russell noted that the only long-term side effect of opiate use is constipation, which would not preclude full-time sedentary work.  Dr. Russell also expressed concern about the rapid increase in oxycodone dosage without appropriate drug testing from October, 2015, to January, 2016.  CF 501.  Dr. Russell opined that plaintiff would likely have been impaired from any occupation in July and August of 2015 (the period of time near his hospital admission from July 19-23, 2015).  CF 500.  Aside from that exception, Dr. Russell stated he would give greater weight to the opinion of Dr. Garas that plaintiff was not disabled due to his mental conditions.  CF 500.  In a letter dated May 3, 2016, Dr. Russell invited Dr. Briones to respond to his findings, but no response was received.  CF 422, 427-28.

<u>Janet Thurston, RN</u>

In a May 23, 2016, addendum to her December 29, 2015, report, Nurse Thurston considered Dr. Russell's file review. Based on the lack of objective information in plaintiff's file and the inconsistencies noted in her previous review, Nurse Thurston concluded that there was no support for the restrictions and limitations posed by Dr. Briones. She concurred with Dr. Russell's conclusion that no condition was present that would preclude plaintiff from engaging in full-time sedentary activity. CF 415.

<u>Appeals Decision</u>

By letter dated May 26, 2016, plaintiff's counsel was advised that DRMS had denied plaintiff's appeal. CF 395-400. The letter noted that additional records submitted on appeal were considered, and that plaintiff's claim was re-evaluated in its totality. CF 396. The letter discussed at length the file reviews by Nurse Thurston and Dr. Russell and referred to the vocational analysis by Ms. Wiley-Gilpatrick. DRMS found that the evidence supported the previous finding that plaintiff was capable of performing full time sedentary work (except for the July and August, 2015, hospitalization period), and that his regular occupation was performed at the sedentary physical demand level. DRMS concluded that the previous decision to deny plaintiff's claim was appropriate. CF 396-399. After receipt of this letter, plaintiff filed the instant action.

<u>V. Analysis</u>

<u>A. Regular Attendance</u>

<u>1. DRMS Decisions</u>

To establish that he is "totally disabled," plaintiff is

required to prove that he met the requirements for LTD benefits as of May 12, 2015, the day following termination of his short term disability benefits.  One of those requirements is that plaintiff was under the "regular attendance" of a physician for injury or sickness.  Plan, Section 2, P 69; Section 8, P 89.  To meet this requirement, plaintiff had to show that he: "1) personally visits a Physician as medically required according to standard medical practice, to effectively manage and treat his Disability; 2) is receiving the most appropriate treatment and care that will maximize his medical improvement and aid in his return to work; and 3) is receiving care by a Physician whose specialty or clinical experience is appropriate for the disability.  Plan, Section 2, P 68.  The use of the conjunctive "and" rather than the disjunctive "or" in this Plan definition indicates that plaintiff is required to prove all three of these elements.  In denying plaintiff's claim on July 17, 2015, DRMS found that plaintiff failed to establish all three of the "regular attendance" components.  CF 124-126.  The original decision denying benefits was upheld on appeal.  CF 399.

Plaintiff contends that the final decision on appeal did not rely on his failure to meet the "regular attendance" requirement, but rather affirmed the original decision based solely on the finding that he was capable of performing his former regular occupation.  This court disagrees.  The decision on appeal quotes the "regular attendance" definition in the Plan as being a "relevant part" of the policy under which plaintiff was covered. CF 395.  The appeal letter notes that the July 17, 2015, decision letter advised plaintiff that he had not met the "regular attendance" requirement, and incorporates that letter by reference, stating: "Please refer to the July 17, 2015 letter for complete

details of the denial of Mr. Bruton's benefits." CF 396. Commenting on "regular attendance" requirements, the appeal letter refers to Nurse Thurston's review comments, at CF 763-64, about the lack of appropriate care for plaintiff's chronic back pain and his failure to follow through with his providers' recommended treatment, including his failure to attend his appointment with Dr. Whetstone and his discharge from physical therapy due to nonattendance. CF 396-97. The appeal letter also notes Dr. Russell's observations that Dr. Briones did not perform random urine drug screens, and that there was no evidence that plaintiff was taking his medication as directed. CF 398. The appeal letter concludes, "Therefore, we conclude our original decision to deny Mr. Bruton's claim was appropriate and we are unable to reverse the decision." CF 399. The appeal letter was sufficient to address and incorporate the "regular attendance" issues raised by the original decision.

2. "Regular Attendance" Requirements

a. Personally Visit a Physician

The first issue is whether plaintiff personally visited a physician as medically required according to standard medical practice to effectively manage and treat his disability. Plaintiff saw Dr. Briones, his primary care physician for treatment of his back pain. Plaintiff argues that his treatment by Dr. Briones was sufficient to satisfy this requirement.

The record includes the summaries of the meetings between Nurse Waterman and Dr. Tossi on July 9 and 10, 2015. CF 101-03. Although plaintiff contends that these notes reflect only the conclusions of Nurse Waterman and that Dr. Tossi never determined

that his treatment with Dr. Briones was not appropriate, it is clear from the summaries that Dr. Tossi also participated in these meetings and reviewed plaintiff's file. There is no indication in the notes that Dr. Tossi disagreed with any of the conclusions documented by Nurse Waterman.

In her report of June 23, 2015, Nurse Waterman commented that it was not clear why plaintiff did not seek additional treatment with Dr. Whetstone, a pain management specialist, as recommended by Dr. Brightman, a neurologist, particularly in light of plaintiff's reports of significantly decreased function and increased pain. Nurse Waterman also observed that it was not unreasonable for plaintiff's primary care physician to monitor his narcotics. CF 161-162. However, her notes of her later meetings with Dr. Tocci on July 9 and 10, 2015, suggest that her views on that point had changed.

On July 9, 2015, Nurse Waterman discussed plaintiff's file with Dr. Tocci. Nurse Waterman noted that plaintiff had been getting regular treatment from his primary care provider with progressive increases in narcotic dosages, but that plaintiff's claim that he could not get an appointment with Dr. Whetstone was inconsistent with the report from Dr. Whetstone's office that plaintiff had an appointment but did not show up. CF 103. At their meeting on July 10, 2015, Nurse Waterman and Dr. Tossi discussed plaintiff's file with DRMS Manager Ferrante and Analyst Nixon. CF 102. Manager Ferrante and Analyst Nixon asked the medical consultants if plaintiff was visiting a physician as medically required according to standard medical practice to effectively manage and treat his back pain. CF 102. The meeting notes express the conclusion of Nurse Waterman and Dr. Tocci that

plaintiff had not visited a physician as medically required to treat his back pain because: 1) plaintiff's back pain was being managed by Dr. Briones, a family practitioner who would not be considered a specialist in pain management; and 2) Dr. Briones managed plaintiff's back pain with increasing doses of narcotics, despite plaintiff's claims that the increased doses did not decrease his pain, and despite the fact that plaintiff's physical exams were largely unremarkable, with few abnormalities being noted. CF 102.

Plaintiff's file was reviewed during the appeal by Nurse Thurston, who opined, "It does not appear that the claimant is receiving the most appropriate care from his PCP [primary care physician] as he has had worsening pain complaints with escalating doses of narcotics on a regular basis." CF 764. She also noted that Dr. Briones had repeatedly advised plaintiff to seek treatment with a physical medicine and rehabilitation ("PMR") provider to more effectively manage and treat his symptoms, but that he did not follow through with that recommendation. CF 764, citing treatment records from Dr. Briones. See CF 280 (May 21, 2014, treatment record noting followup with a PMR as part of treatment plan); CF 272 (February 3, 2015, treatment record noting followup with a PMR); CF 268 (March 16, 2015, treatment record noting referral to Dr. Whetstone); CF 145 (June 24, 2015, treatment record noting plan to refer to a PMR if MRI is unchanged); CF 775 (July 8, 2015, treatment record noting followup with a PMR); and CF 773 (August 5, 2015, treatment record recommending referral to a PMR in light of

recent hospitalization[2]).

Plaintiff's records were also reviewed during the appeal by Dr. Russell.  CF 502.  Although Dr. Russell did not specifically express an opinion in his April 18, 2016, report concerning whether plaintiff was visiting a physician as medically required according to standard medical practice to effectively manage and treat his back pain, he did express concerns about plaintiff's treatment by Dr. Briones  which are relevant to that issue.  Dr. Russell noted that there was no pain contract in the file, and that, because there were no random urine drug screens, there was no evidence that plaintiff was taking his medication as directed as opposed to diverting it elsewhere.  CF 499.  Dr. Russell also observed that, despite the lack of an identified pain generator or physical and imaging exam findings supporting plaintiff's complaints of pain, plaintiff had been treated with rapidly increasing doses of opiates which, according to plaintiff, had not appreciably reduced his pain.  CF 499-500.  After reviewing additional records from Dr. Briones, Dr. Russell indicated that his opinion that plaintiff was not disabled was unchanged and stated, "I would be very concerned about the rapid increase in oxycodone dosage in the three month interval from 10/2015 to 1/2016, especially without appropriate drug testing."  CF 501.

Having reviewed the treatment records de novo, the court agrees with the assessment of the above experts.  Those records show that plaintiff was prescribed increasing doses of opiate pain

---

[2]Although plaintiff did see Dr. Simik, a PMR specialist, on August 17, 2015, he did not pursue any additional treatment with Dr. Simik, who had a lengthy discussion with plaintiff concerning treatment options.  CF 453.

medication despite largely normal physical exam findings, with no pain contract or drug testing. The lack of any monitoring of plaintiff's pain medication is troubling in light of the February 12, 2016, report of Dr. Mosley, a pain management specialist, who determined that plaintiff was at high risk for medication misuse. CF 446. The records of plaintiff's hospital admission on July 19, 2015, for complaints of abdominal pain, nausea, vomiting, diarrhea, and altered mental state also support a finding that plaintiff's treatment with pain medication was not being effectively monitored by Dr. Briones, who was not a specialist in pain management. The hospital records indicate that the cause of plaintiff's symptoms was "likely multifactorial with polypharmacy and alcohol withdrawals" and "due to long-standing opioid use." CF 842. The records note that number of medications had been changed recently, and plaintiff had stopped taking his opioid medication the previous day due to constipation. CF 847.

The court agrees with the Plan's decision on this branch of the "regular attendance" provision, and finds that plaintiff did not personally visit a physician as medically required according to standard medical practice to effectively manage and treat his back pain.


b. Receive the Most Appropriate Treatment

The second element of the "regular attendance" definition requires proof that the claimant "is receiving the most appropriate treatment and care that will maximize his medical improvement and aid in his return to work." Plan, Section 2, P 68. DRMS found that plaintiff was not receiving the most appropriate treatment that would maximize his medical improvement, noting plaintiff's

failure to have a repeat MRI, to try aquatic therapy, or to follow through with the referral to Dr. Whetstone, a physical medicine and rehabilitation specialist.

In regard to the recommended MRI, the record indicates that Dr. Briones discussed the need for another MRI with plaintiff on May 26, 2015, but plaintiff stated that he would prefer to delay the MRI for four weeks until he changed to new insurance. CF 143. Plaintiff told Analyst Nixon on June 17, 2015, that he could not afford another MRI, as his insurance would not pay for it so soon after the January MRI. CF 175. Plaintiff informed Analyst Nixon on July 14, 2015, that the MRI in January cost $1,200 and that he could not afford anther one. CF 100.

Plaintiff argues that the fact that he did not follow his doctor's recommendation for another MRI should be excused because of the cost. However, the Plan provides that benefits are paid only when "proof of continued Disability is submitted to AUL upon request and the Person is under the Regular Attendance and care of a Physician. The proof must be submitted at the Person's expense." Plan, Section 8, P85. There is no cost exception to this requirement under the Plan. This provision and the other "regular attendance" requirements would be nullified if all a claimant had to do to avoid their application was to plead the inability to afford any kind of treatment.

Plaintiff also contends that "most appropriate treatment" may not necessarily be optimal treatment or the best treatment money can buy. He argues that another MRI was not "the most appropriate treatment" because there has been no showing that another MRI would have altered his doctor's treatment plan. By the same token, there is no evidence that the results of another MRI would not have

38

changed plaintiff's treatment plan.  Because another MRI was never performed, there is no way of definitively knowing what the results would have been or what impact those results would have had on plaintiff's treatment.

There is no Plan language which requires that a diagnostic test be successful or achieve a particular outcome.  A diagnostic test may constitute the "most appropriate treatment" for attempting to identify the cause of symptoms such as pain even if the test, when performed, simply eliminates a particular cause or is inconclusive.  When Dr. Briones discussed the need for another MRI with plaintiff on May 26, 2015, see CF 143, she had been treating plaintiff for over a year.  Dr. Briones may well have been frustrated by plaintiff's reports that he had no decrease in pain despite a steady increase in the dosage of opiate medication being prescribed.  Dr. Briones could reasonably have concluded that another MRI, possibly interpreted by a different physician, might reveal the elusive "pain generator" referred to by Dr. Russell, CF 499, which had previously escaped detection.  The record evidence demonstrates that another MRI was the "most appropriate treatment" option for Dr. Briones to pursue under these circumstances.

The record also shows that plaintiff failed to pursue the aquatic therapy recommended by Mount Carmel Rehab Services, plaintiff's physical therapy provider.  He cancelled his aquatic therapy appointment without rescheduling.  CF 188.  Plaintiff argues that because he noticed no improvement with other types of physical therapy, he should not be penalized for not engaging in aquatic therapy.  However, plaintiff did not attend even one aquatic therapy session, and offers nothing but his own lay opinion that this type of therapy would not "maximize his medical

improvement or aid in his return to work." Plan, Section 2, P 68. The fact that his physical therapy treatment provider recommended this type of treatment is evidence that it was the most appropriate treatment. By not trying the recommended aquatic therapy, plaintiff failed to show that he was receiving the most appropriate treatment.

The record further shows that plaintiff did not follow through with the February 16, 2015, referral by Dr. Brightman to Dr. Whetstone, a physical medicine and rehabilitation specialist. CF 225-256. Plaintiff offered three different excuses for his failure to see Dr. Whetstone. He first told Analyst Nixon that there was a three-month wait for an appointment. When Analyst Nixon informed him that DRMS was aware that plaintiff had an appointment with Dr. Whetstone on April 21, 2015, but did not attend that appointment, plaintiff then stated that this was because of the cost and because he had seen a pain management provider for injections in the past and they never worked. CF 100. Plaintiff later stated, via a letter from his attorney, that he thought that the appointment was for physical therapy and he was already in a physical therapy program at the time. CF 691-92.

Plaintiff's claims as to why the referral to Dr. Whetstone was not appropriate treatment are based on speculation. Because plaintiff never consulted with Dr. Whetstone, there is no evidence as to what type of treatment may have been recommended by Dr. Whetstone. He may have recommended a different type of treatment that plaintiff had not tried before. There is no way of knowing whether the treatment which would have been recommended by Dr. Whetstone would have had no effect on plaintiff's pain. The fact that other treatments had not worked indicates that pursuing

another treatment option with Dr. Whetstone, a specialist in pain management, was the most appropriate treatment that Dr. Brightman, a neurologist, could recommend in light of plaintiff's medical history. By not following through with this referral, plaintiff was not receiving the "most appropriate treatment" available. The court also notes that after the initial denial of his LTD claim, plaintiff saw Dr. Simek, a physical medicine and rehabilitation specialist, on August 17, 2015. CF 453. Although Dr. Simek's notes reflect that he and plaintiff discussed various treatment options, there is no evidence that plaintiff returned to Dr. Simek for further treatment.

The court finds that plaintiff failed to prove that he was "receiving the most appropriate treatment and care that will maximize his medical improvement and aid in his return to work." Plan, Section 2, P 68.

## c. Receiving Care by a Specialist

The third element of the "regular attendance" requirement is that the claimant is receiving care by a physician whose specialty or clinical experience is appropriate for the disability. Plan, Section 2, P 68. DRMS concluded that plaintiff had not satisfied this element because his pain was being managed with increasing doses of narcotics by Dr. Briones, a primary care physician who would not be considered a specialist in the management of chronic pain. CF 126.

Although Nurse Waterman initially noted in her report of June 23, 2015, that it was not unreasonable for Dr. Briones to monitor plaintiff's narcotics, she further stated that "given the Claimant's reports of significantly decreased function as well as

increased pain, it is unclear why he has not sought out additional treatment with pain management as was recommended." CF 162. Upon discussing plaintiff's file on July 10, 2015, Dr. Tossi and Nurse Waterman concluded that Dr. Briones was not a specialist in the management of chronic pain, "particularly when coupled with his increasing pain level despite increased dosages of narcotics." CF 102. They opined that plaintiff was not receiving care from a physician whose speciality or clinical expertise is appropriate. CF 102.

Nurse Thurston noted in her report of December 29, 2015, that it would be appropriate for plaintiff to treat with a physical medicine and rehabilitation provider or a pain management provider. Nurse Thurston commented that Dr. Briones had repeatedly advised plaintiff to seek treatment from such a specialist to more effectively manage and treat his symptoms, but that plaintiff did not follow through with this recommendation. CF 764. She concluded, "It does not appear that the claimant is receiving the most appropriate care from his PCP as he has had worsening pain complaints with escalating doses of narcotics on a regular basis." CF 764. In his report, Dr. Russell expressed concern over the lack of a pain contract and the rapid increase in oxycodone dosage prescribed by Dr. Briones, without appropriate drug testing or random urine drug screens. CF 499, 501.

Based on a de novo review of the records, this court agrees with the above expert opinions and with the Plan's conclusion that plaintiff was not receiving care by a physician whose specialty or clinical experience was appropriate for his back pain.

B. Total Disability

1. Plaintiff's Regular Occupation

To prove that he is "totally disabled," plaintiff also had to prove that he "cannot perform the Material and Substantial Duties of his Regular Occupation[.]  Plan, Section 2, P 69.  The term "REGULAR OCCUPATION" means the claimant's occupation "as it is recognized in the general workplace and according to industry standards[,]" not the specific job tasks the claimant performed for the employer.  Plan, Section 2, P 68.

In denying plaintiff's claim for LTD benefits, DRMS relied on the report of Nancy Wiley-Gilpatrick, a vocational rehabilitation counselor who analyzed plaintiff's job description with his former employer, Resource Ventures.  She determined that in the national economy, plaintiff's occupation was most analogous to the position of Manager, Data Processing, a position performed at the sedentary level.  CF 164.  In her June 18, 2015, report, Ms. Wiley-Gilpatrick explained that the sedentary level was work involving exerting up to ten pounds of force occasionally, exerting a negligible amount of force frequently to lift, carry, push, pull or otherwise move objects, including the human body, and sitting most of the time, with brief periods of time for walking or standing required only occasionally.  CF 164.  There is no evidence in the record which contradicts Ms. Wiley-Gilpatrick's opinion.  The court finds that plaintiff's regular occupation was performed at the sedentary level in the general workplace and according to industry standards.


2. Claim of Disability Due to Back Pain

In regard to plaintiff's claim that he was disabled due to back pain, the record includes two attending physician statements

completed by Dr. Briones. In the initial attending physician statement dated February 12, 2015, Dr. Briones checked the box indicating that plaintiff was capable of sedentary activity. CF 374. She indicated that plaintiff could occasionally bend, climb, reach, kneel, squat, crawl, push/pull, and lift up to ten pounds. She also specified that plaintiff should not bend, twist, stand for more than thirty minutes at a time, or sit more than one hour at a time. CF 374.

On April 20, 2015, Dr. Briones completed an attending physician's statement which was submitted by plaintiff to begin the review procedure for his claim for LTD benefits. Dr. Briones indicated that plaintiff should avoid, or was incapable of, bending, twisting, lifting, strenuous activity, exercising outside a physical therapy program, and coping with stressful, high emotional situations. CF 319. Dr. Briones specified that plaintiff could engage in zero hours of sedentary activity and was house confined, and that she did not expect any significant improvement in the future. CF 320.

Other treatment records contradict the April, 2015, opinion of Dr. Briones. According to the report of Dr. Daniel J. White, the 2015 MRI showed no significant abnormality in some areas, and only mild lower lumbar spondylosis, mild acquired central canal stenosis, and mild foraminal narrowing in other areas. There was no significant change from the 2010 MRI and the 2015 MRI. CF 246. The February 16, 2015, exam by Dr. Brightman, a neurologist, noted plaintiff's complaints of pain and a positive straight leg raising on the right at ninety degrees, but normal motor, sensory and reflex testing, good peripheral muscle tone, and a normal mental status exam. She further observed that the 2015 MRI showed mild to

44

moderate spinal stenosis in two locations, but that the disks looked good and there was no degenerative disk disease. She diagnosed moderate spinal stenosis. CF 255-256. During the August 17, 2015, examination by Dr. Simek, a physical medicine and rehabilitation specialist, plaintiff was limited in the lumbar spine area with flexion and extension with poor effort due to pain, but the examination showed no abnormality, the spine was negative for posterior tenderness, no motor weakness was noted, and balance and gait were intact. Dr. Simek saw no indication for surgery. CF 453.

The record includes the treatment notes of Dr. Briones, but those notes do not support the extent of the limitations posed in the April attending physician's statement. As Nurse Waterman observed in her report of June 23, 2015, the treatment records of Dr. Briones noted tenderness with palpitation to the paraspinal muscles, occasional findings of decreased strength, and gait favoring the affected side, but most physical exam findings were normal. CF 161. Nurse Waterman opined that the physical exam findings as a whole were inconsistent with a significantly impairing back condition. CF 161. She also remarked on the lack of any clear change in plaintiff's condition between Dr. Briones's February 12, 2015, evaluation stating that plaintiff was capable of sedentary level activity and the April, 2015, attending physician statement opining that plaintiff was incapable of even sedentary work. CF 161. Nurse Waterman concluded that the medical records did not support the restrictions indicated in the April, 2015, attending physician's statement, and that there was minimal objective data to support a loss of function due to back pain. CF 161-62. Based on this court's review of the treatment records of

Dr. Briones and the other treating physicians, Nurse Waterman's analysis of these records is accurate.

On February 12, 2016, Dr. Mosley, a pain management specialist, examined plaintiff. However, the reliability of Dr. Mosley's assessment of plaintiff's physical condition is undermined to some extent by other evidence. Dr. Mosley noted tenderness and spasms in the lumbar spine and paravertebral muscles, with a limited range of motion. On that same day, plaintiff was observed driving onto the driveway of his residence, using his left foot to kick open and to hold the driver's door open while holding a stack of papers, and walking towards the residence without any guarded motion. See CF 592. Dr. Mosley referred plaintiff back to Dr. Briones for medication management. CF 489. However, several experts concluded that Dr. Briones was not a specialist in pain management and raised questions concerning her management of plaintiff's medications. Dr. Mosley opined that plaintiff's next option was surgery or a spinal cord stimulator. CF 488. Although Dr. Mosley noted that imaging studies had been done on plaintiff's lumbar region, see CF 487, he did not indicate that he had reviewed or considered the MRI results. In contrast, Dr. Russell disagreed with Dr. Mosley's assessment that back surgery or a spinal cord stimulator were viable treatment options. He noted that there was nothing to do surgery on, as the alleged pain generator had not been identified and there was no evidence of degenerative or bulging discs, facet arthropathy, or nerve root pressure. CF 499–500.

The opinion of Dr. Russell also refutes the April attending physician's statement. Dr. Russell observed that the MRI findings in 2015 were essentially identical to the findings in 2010, after

46

which plaintiff continued to work.  CF 499.   Dr. Russell also noted that plaintiff's only symptom was pain, and that his pain complaints were in excess of what would be expected based on the objective imaging and physical examination findings.  CF 500.  Dr. Russell concluded that the restrictions and limitations posed by Dr. Briones were excessive, as they were based solely on plaintiff's pain complaints without evidence of objective pathology, such as imaging studies or electrodiagnostic tests, to support those complaints.  CF 500.

Dr. Russell opined that plaintiff "would have likely been impaired from any occupation in July and August 2015."  CF 500. This refers to the general time frame around plaintiff's July hospitalization.  CF 806-875.  The hospital records show that following his admission on July 19, 2015, plaintiff's symptoms resolved after starting Valium, and that he improved throughout the period of hospitalization through his discharge on July 23, 2015. CF 842.  This brief five-day period of hospitalization does not establish that plaintiff was totally disabled as of May 12, 2015, the date LTD benefits would have commenced if eligibility had been shown, or that he was totally disabled as of July 17, 2015, the date DRMS denied the claim for benefits.

Nurse Thurston reviewed plaintiff's records during the pendency of the appeal.  She opined that there was no support for the restrictions and limitations posed by Dr. Briones, and agreed with Dr. Russell's conclusion that no condition was present that would preclude plaintiff from engaging in full-time sedentary activity.  CF 415.  In her report of December 29, 2015, Nurse Thurston noted that the severity of the reported pain symptoms was not consistent with the MRI and exam findings.  CF 763.  She also

cited a July, 2015, hospital record documenting plaintiff's report that he traveled to New Mexico in April, 2015, and walked on a farm along a stream in July of 2015. CF 763, 849. Plaintiff also traveled to New Mexico in August of 2015 to attend his father's funeral. CR 691-92.

The court finds that the administrative record does not establish by a preponderance of the evidence that plaintiff was totally disabled due to his back condition so as to be unable to perform the material and substantial duties of his regular occupation, which, according to the uncontested opinion of Ms. Wiley-Gilpatrick, was performed at the sedentary level. The treatment records of Dr. Briones document plaintiff's subjective complaints of pain, particularly in regard to tender paraspinal muscles, and occasionally an unsteady gait. However, the physical exam findings largely document an otherwise normal curvature of the spine with no vertebral spine tenderness, negative straight leg raise, and normal sensory and reflex exams. Dr. Briones first opined in her February 12, 2015, attending physician's statement that plaintiff was capable of engaging in sedentary work, and indicated a return-to-work date of May 8, 2015. In her April 20, 2015, attending physician's statement, Dr. Briones indicated that plaintiff was incapable of engaging in any work without pointing to any change in plaintiff's condition in the preceding two-month period to justify that opinion.

The court notes that Dr. Briones was the only physician who expressed the opinion that plaintiff was unable to engage in employment. Although Dr. Briones is a treating physician, courts in ERISA cases have held that no special weight or deference must be accorded to the opinions of the plaintiff's treating physician.

Balmert v. Reliance Standard Life Ins. Co., 601 F.3d 497, 504 (6th
Cir. 2010)(citing Black & Decker Disability Plan v. Nord, 538 U.S.
822, 831 (2003)); Calvert v. Firstar Finance, Inc., 409 F.3d 286,
293 (6th Cir. 2005)("treating physician rule" does not apply in the
ERISA context).  A lack of objective medical evidence upon which to
base a treating physician's opinion is sufficient reason for a
decision not to credit that opinion.  Boone v. Liberty Life Assur.
Co. of Boston, 161 F.App'x 469, 473 (6th Cir. 2005).

    The court accepts the expert opinions of Nurse Waterman and
Nurse Thurston that the physical exam findings as a whole were
inconsistent with a significantly impairing back condition.  The
court agrees with Dr. Russell's expert observations that
plaintiff's only symptom was pain, and that his pain complaints
were in excess of objective imaging and physical examination
findings.  The court is also persuaded by the expert opinions of
Nurse Thurston and Dr. Russell that there is no support for the
restrictions and limitations posed by Dr. Briones, which are based
solely on plaintiff's pain complaints without evidence of objective
pathology.  The court concludes that there is a lack of objective
medical and other evidence to support Dr. Briones's opinion that
plaintiff is incapable of his regular sedentary employment, and the
court rejects that opinion.

    The court acknowledges that no functional capacity evaluation
("FCE") was obtained in this case.  Nurse Waterman's notes of her
July 9, 2015, meeting with Dr. Tocci state that "[after discussion
with Dr. Tocci, recommendation was made for [an] FCE ... for
definitive examination of function."  CF 103.  However, Nurse
Waterman and Dr. Tocci met the next day with Analyst Nixon, at
which time plaintiff's claim was essentially resolved in their view

by his failure to meet the "regular attendance" requirement. CF 102.

The fact that DRMS did not arrange for an FCE in this case does not weigh in favor of plaintiff's claim for benefits or undermine a finding of nondisability. Nothing in the Plan language required AUL to obtain an FCE. Rather, the Plan gives AUL the discretionary "right" to require a physical examination which "may be exercised as often as is reasonably necessary, as determined by AUL[.]" Plan, Section 7A, P 82. The Plan places the burden on the claimant to furnish proof that the claimant is totally disabled. See Plan, Section 8, P 89, 92. Plaintiff's medical records were reviewed by two medical consultants, Nurse Waterman and Dr. Tocci, at the initial level, and by two new medical consultants, Nurse Thurston and Dr. Russell, at the appeals level. These medical records documented the observations of plaintiff's treating physicians, who did personally examine plaintiff.

The court also concludes that the fact that short term disability benefits were awarded in this case does not support an award of LTD benefits because the two determinations were based on different records. On March 30, 2015, the date of the award of short term disability benefits, DRMS had a handful of medical records, including the February 12, 2015, attending physician statement of Dr. Briones. In that statement, Dr. Briones expressed the opinion that plaintiff had marked limitations. She indicated that the MRI revealed spinal stenosis and spondylosis (notably with no discussion of the mild nature of those conditions, see CF 246), and stated that plaintiff had depression, anxiety, and memory loss. CF 373-374. DRMS Nurse Cindi Read concluded that the records then before her indicated that plaintiff's physical and mental health

50

conditions, taken together, would be impairing, and that an award of short term benefits through May was warranted. CF 323. She advanced no opinion as to whether LTD benefits should be awarded. Even Dr. Briones indicated that she planned to release plaintiff to return to work on May 8, 2015, which suggested that plaintiff's level of impairment at the time was temporary. CF 374.

In contrast, as Analyst Nixon informed plaintiff, an application for LTD benefits could "involve a detailed and lengthy evaluation process." CF 311. Plaintiff's LTD claim was initially denied based on many additional medical records and the review of plaintiff's file by two medical consultants. The appeal was denied following the receipt of even more medical records and a review of the updated file by two additional medical consultants.

Based on the foregoing, the court agrees with the determination of DRMS that plaintiff was not physically disabled due to back pain from performing the material and substantial duties of his regular sedentary occupation.

## 3. Claim of Disability Due to Mental Health Issues

Dr. Brightman noted a normal mental health status exam in her treatment record of February 16, 2015. CF 255. However, Dr. Briones stated in her attending physician statement dated April 20, 2015, that plaintiff had depression with anxiety, a depressed mood, and a high stress level. CF 319. She specified that plaintiff should avoid stressful and highly emotional situations. CF 319. She checked the box indicating that plaintiff was unable to engage in stress situations or interpersonal relationships. CF 320. After that date, plaintiff began psychiatric treatment with Dr. Garas.

The record includes treatment records documenting six counseling sessions with Dr. Garas during the one-year period from April, 2015, through March, 2016.  CF 751-54, 1024-25.  At the time of the initial decision denying benefits, only an intake interview and the notes from plaintiff's appointment with Dr. Garas on April 27, 2015, had been submitted.  Additional records from Dr. Garas were submitted during the appeal.  These records indicate that Dr. Garas prescribed medication to treat plaintiff's depression.  CF 752-754, 1025-25.  However, Dr. Garas declined to complete a mental capacity evaluation form, stating that she did not think that plaintiff should be on disability.  CF 602, 620-23.

In her report of June 23, 2015, Nurse Waterman noted that plaintiff's statement that he was attending only monthly counseling sessions was inconsistent with a significantly impairing mental condition.  CF 161.  Nurse Thurston observed in her December 29, 2015, report that no neuropsychiatric testing had been done.  CF 762-63.  In his April 18, 2016, review of the file, Dr. Russell noted that plaintiff's treatment with an anti-anxiety medication and an antidepressant appeared to be successful.  CF 500.  Dr. Russell acknowledged the opinion of Dr. Briones that plaintiff was impaired by his behavioral health conditions.  However, he gave greater weight to the opinion of Dr. Garas, plaintiff's psychiatrist, that plaintiff was not disabled due to his mental symptoms, as she was a more appropriate provider to comment on these conditions.  CF 500.

The court finds that the record fails to establish that plaintiff is disabled due to his mental conditions.  Dr. Briones noted on the April 20, 2015, attending physician's statement that plaintiff had been diagnosed as having depression with anxiety;

that he had symptoms consisting of depressed mood and a high stress level; and that he should avoid stressful and highly emotional situations; and that he was unable to engage in interpersonal relations. CF 319-20. However, she gave no explanation on this form as to the basis for these conclusions or how these limitations would preclude plaintiff from engaging in his regular occupation. Her conclusions are not supported by neuropsychiatric testing. In addition, Dr. Briones is not a specialist in mental health. As of April, 2015, Dr. Garas took over plaintiff's mental health counseling and treatment. Dr. Garas stated that she did not feel that plaintiff's mental health conditions were disabling. CF 602, 620-23. As a specialist in psychiatry, Dr. Garas was in a better position to express an opinion concerning plaintiff's mental health conditions.

The record also fails to show that plaintiff is disabled because he is taking various medications. Dr. Russell noted in his report that the cognitive effects of opiate use generally last less than two weeks, after which the patient adjusts to them. CF 500 He stated that based on the length of time plaintiff had been taking opiates, the case "for ongoing cognitive effects is not supported." CF 500. Dr. Russell further indicated that the only long-term side effect of opiates is constipation, which would not preclude full-time sedentary work. CF 500. In her report dated December 29, 2015, Nurse Thurston noted that plaintiff's reports of memory problems while taking medication were not consistent with the exam findings (with the exception of the July, 2015, hospitalization) or with plaintiff's reports of his activities. CF 762-63. Dr. Garas, plaintiff's treating psychiatrist, never expressed the opinion that the medication she prescribed to treat

plaintiff's depression and anxiety would affect his cognitive ability to perform his regular occupation. CF 602, 620-23. In fact, none of plaintiff's treating physicians, including Dr. Briones, expressed the specific opinion that plaintiff was mentally incapable of performing the duties of his regular occupation due to the medications he was taking.

## 4. Combined Effect of Physical and Mental Symptoms

The court has also considered whether plaintiff is totally disabled due to the combined effect of his back condition and his mental health conditions. Based on the foregoing discussion, this court cannot conclude by a preponderance of the evidence that plaintiff is disabled from engaging in his regular sedentary occupation due to his back pain and mental health symptoms combined.

## VI. Conclusion

In accordance with the foregoing, the court concludes that plaintiff has failed to prove by a preponderance of the evidence that he was "totally disabled" as that term is defined in the Plan. The administrative record fails to establish by a preponderance of the evidence that plaintiff was under the regular attendance of a physician, and that he was unable due to his physical and mental conditions to perform the material and substantial duties of his regular sedentary occupation. The court agrees with the Plan's decision to deny LTD benefits. Defendants' motion for judgment on the administrative record (Doc. 20) is granted, and plaintiff's motion for judgment on the administrative record (Doc. 16) is denied.

It is so ordered.

Date: April 25, 2019                    <u>        s/James L. Graham        </u>
                                        James L. Graham
                                        United States District Judge